Robert Ukeiley (CO Bar #26747)
CENTER FOR BIOLOGICAL DIVERSITY
1536 Wynkoop Street, Ste. 421
Denver, CO 80202
Phone: 720-496-8568
email: rukeiley@biologicaldiversity.org

*Counsel for Plaintiff*
*Additional Counsel Listed in Signature Block*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**
**TUCSON DIVISION**

| | |
|---|---|
| Center for Biological Diversity, | ) Case No: |
| Plaintiff, | ) |
| vs. | ) **COMPLAINT FOR DECLARATORY** |
| | ) **AND INJUNCTIVE RELIEF** |
| E. Scott Pruitt, in his official capacity as | ) (Environmental Matter—Endangered |
| Administrator of the U.S. Environmental | ) Species Act and National Environmental |
| Protection Agency, and U.S. Environmental | ) Policy Act) |
| Protection Agency, | ) |
| Defendants. | ) |

## I.  INTRODUCTION

1.     Plaintiff the Center for Biological Diversity (Center) brings this Endangered Species Act (ESA) citizen suit to compel the United States Environmental Protection Agency (EPA) to consult with the United States Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) [collectively, the Services] over its delay of

1   the effluent limitation guidelines for toxic discharges into water from coal-burning power

2   plants (Delay Rule[1]).  The Center also seeks to compel EPA to conduct a review of the

3   Delay Rule pursuant to the National Environmental Policy Act (NEPA).

## II. JURISDICTION

5   2.      The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 16 U.S.C. §

6   1540(g)(1)(A).  The Court has jurisdiction to review EPA's failure to consult with the

7   Services under the citizen-suit provision of the ESA, 16 U.S.C. § 1540(g)(1), and

8   pursuant to 28 U.S.C. § 1331, which provides that the "district courts shall have

9   jurisdiction . . . to enforce any such provision or regulation" of the ESA.

10   3.      An actual controversy exists between the parties.  This case does not concern

11   federal taxes, is not a proceeding under 11 U.S.C. §§ 505 or 1146, and does not involve

12   the Tariff Act of 1930.  Thus, this Court has authority to order the declaratory relief

13   requested under 28 U.S.C. § 2201.  If the Court orders declaratory relief, 28 U.S.C. §

14   2202 authorizes this Court to issue injunctive relief.

## III. NOTICE

16   4.      As required by the ESA, the Center provided 60 days notice of its intent to sue by

17   letter sent to EPA and the Services on October 12, 2017.  More than 60 days have passed

18   since EPA received this "notice of intent to sue" letter.  EPA has not remedied the

19   violations alleged in this Complaint.  Therefore, a present and actual controversy exists.

20

---

21   [1] Postponement of Certain Compliance Dates for the ELGs and Standards For Steam
    Electric Power Generating Point Source Category, 82 Fed. Reg. 43,494 (Sept. 18, 2017)
22   (codified at 40 C.F.R. §§ 423.11(t); 423.13(g)(1)(i), (k)(1)(i); 423.15(e), (g)).

1

## IV.  VENUE

2   5.      The Center resides in this judicial district and in Pima County, which is in the

3   Tucson Division.  Defendant EPA resides in this judicial district.  This is a civil action in

4   which a defendant is an agency of the United States.  No real property is involved in this

5   action.  Therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

6

## V.  PARTIES

7   6.      Plaintiff the CENTER FOR BIOLOGICAL DIVERSITY (Center) is a non-profit

8   501(c)(3) corporation with its principle place of business in Tucson, Arizona.  The Center

9   has approximately 63,000 members throughout the United States and the world.

10   7.      The Center's mission is to ensure the preservation, protection, and restoration of

11   biodiversity, native species, ecosystems, public lands and waters, and public health

12   through science, policy, and environmental law.  Based on the understanding that the

13   health and vigor of human societies and the integrity and wildness of the natural

14   environment are closely linked, the Center is working to secure a future for animals and

15   plants hovering on the brink of extinction, for the ecosystems they need to survive, and

16   for a healthy, livable future for all of us.

17   8.      The Center's members live, work, recreate, travel and engage in other activities

18   throughout the areas at issue in this complaint and will continue to do so on a regular

19   basis.  Toxic discharges from coal-burning power plants allowed under the Delay Rule in

20   the affected areas threatens and damages, and will continue to threaten and damage, the

21   health and welfare of Center's members as well as their ability to engage in and enjoy

22   their other activities.  Toxic discharges from coal-burning power plants allowed under the

Delay Rule diminish the Center's members' ability to enjoy the aesthetic qualities and recreational opportunities of the affected area.

9.      EPA's failure to timely consult with the Services and conduct an analysis under NEPA also adversely affects the Center, as well as its members, by depriving them of procedural protection and opportunities, as well as information that they are entitled to under NEPA and the ESA.  The failure of EPA to timely consult with the Services and conduct an analysis under NEPA also creates uncertainty for the Center's members as to whether they and the water bodies they enjoy are exposed to excess toxic discharges and indirect impacts.

10.      The above injuries will continue until the Court grants the relief requested herein.

11.      Defendant Scott Pruitt is the Administrator of the EPA.  Defendant EPA is an agency of the United States.  EPA has authority to limit toxic effluent discharged from coal-burning power plants.  Under the ESA, EPA is responsible, in consultation with the Service, for ensuring that its authorization of toxic effluent discharges from coal-burning power plants do not jeopardize the survival and recovery of listed species or adversely affect their critical habitat. *See* 16 U.S.C. § 1536(a)(2).

## VI.  LEGAL BACKGROUND

### A.      The Endangered Species Act

12.      Congress enacted the ESA, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved . . . [and] a program for the conservation of such endangered species and threatened species . . . ." *Id*. § 1531(b).

1    13.    The ESA vests primary responsibility for administering and enforcing the statute

2    with the Secretaries of Commerce and Interior.  The Secretaries of Commerce and

3    Interior have delegated this responsibility to the National Marine Fisheries Service

4    (NMFS) and the Fish and Wildlife Service (FWS) respectively.

5    14.    When a species has been listed as threatened or endangered under the ESA, all

6    federal agencies—including the EPA—must ensure that their programs and activities are

7    in compliance with the ESA.

8    15.    To this end, Section 7(a)(2) of the ESA requires that all federal agencies "insure"

9    that their actions "are not likely to jeopardize the continued existence of any endangered

10    species or threatened species or result in the destruction or adverse modification of" their

11    critical habitat. *Id*. § 1536(a)(2).  The "institutionalized caution" embodied in the ESA

12    requires federal agencies to give the benefit of the doubt to listed species and places the

13    burden of risk and uncertainty on the proposed action. *See Sierra Club v. Marsh*, 816

14    F.2d 1376, 1386 (9th Cir. 1987); *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

15    16.    The ESA establishes an interagency consultation process to assist federal agencies

16    in complying with their substantive section 7(a)(2) duty to guard against jeopardy to

17    listed species or destruction or adverse modification of critical habitat. Under section

18    7(a)(2), federal agencies must consult with the appropriate expert fish and wildlife

19    agency to determine whether their actions will jeopardize any listed species' survival or

20    adversely modify designated critical habitat and, if so, to identify ways to modify the

21    action to avoid that result. *See* 50 C.F.R. § 402.14.

22

17.     The National Marine Fisheries Service (NMFS) is the expert fish and wildlife agency with respect to anadromous and marine species and the U.S. Fish and Wildlife Service (FWS) is the expert agency with respect to terrestrial and freshwater species.

18.     The Services have adopted joint regulations governing the section 7(a)(2) consultation process.  Under the joint regulations, a federal agency must initiate a section 7(a)(2) consultation with NMFS or FWS whenever it undertakes an "action" that "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a).  The threshold for a "may affect" determination and the required ESA section 7(a)(2) consultation is low. *See* 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement . . . ."). *See also* U.S. FISH & WILDLIFE SERV. & NAT'L MARINE FISHERIES SERV., ENDANGERED SPECIES CONSULTATION HANDBOOK 3-13, 4-26 (1998).  An agency is relieved of the obligation to consult only if the action will have "no effect" on listed species or designated critical habitat.

19.     The joint regulations broadly define the scope of agency actions subject to ESA section 7(a)(2) mandates to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by [f]ederal agencies," including the promulgation of regulations and the granting of licenses. *See* 50 C.F.R. § 402.02 (definition of "action").

20.     If an agency determines that its action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat, ESA regulations permit "informal consultation," in which there is no requirement for a biological opinion so long as NMFS

or FWS concurs in writing with the "not likely to adversely affect" determination. *Id*. § 402.13.  If the Service(s) do not concur with the "not likely to adversely affect" determination or if the action agency determines that the action is "likely to adversely affect" the listed species, the agencies must engage in "formal consultation." *Id*. §§ 402.02, 402.14(a).

21.     Formal consultation "is a process between the Service and the [f]ederal agency that commences with the [f]ederal agency's written request for consultation under section 7(a)(2) of the Act and concludes with the Service's issuance of the biological opinion under section 7(b)(3) of the Act." *Id*. § 402.02.

22.     In a biological opinion, the Services must determine whether the federal action subject to the consultation will jeopardize the survival and recovery of listed species or will destroy or adversely modify critical habitat. 16 U.S.C. § 1536(b)(4).  If the Services determine that the action will jeopardize the species or destroy or adversely modify its critical habitat, the biological opinion must specify any reasonable and prudent alternative the action agency could take to avoid jeopardy or specify that there is no reasonable and prudent alternative. *Id*. § 1536(b)(4)(A); 50 C.F.R. § 402.14(h)(3).  The Services and the action agencies must use the best available science in consultations, biological opinions, and jeopardy and adverse modification determinations. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

23.     Compliance with the procedural provisions of the ESA—identifying the likely effects of the action through the consultation process—is integral to compliance with the substantive requirements of the Act.  Under the statutory framework, federal actions that

"may affect" a listed species or critical habitat may not proceed unless and until the federal agency ensures, through completion of the consultation process, that the action is not likely to cause jeopardy or adverse modification of critical habitat. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.13, 402.14; *see also* 16 U.S.C. § 1536(d).

24.     Even after the procedural requirements of a consultation are complete, the ultimate duty to ensure that an action will not likely jeopardize a listed species or adversely modify its critical habitat lies with the action agency.  If the Services find that a proposed action avoids jeopardy and adverse modification of critical habitat, this substantive duty is fulfilled by implementing that action in accordance with any conditions or requirements established during the consultation process, including any measures necessary to minimize take.  If the Services develop a reasonable and prudent alternative necessary to avoid jeopardy and/or adverse modification of critical habitat, the action agency can most easily fulfill its substantive duty by implementing the reasonable and prudent alternative and any other measures developed during the consultation process.

25.     However, an action agency is technically free to choose another alternative course of action if it can independently ensure that the alternative will avoid jeopardy and adverse modification.

       B.     National Environmental Policy Act

26.     The National Environmental Policy Act is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).  Its twin aims are to facilitate informed agency decision-making and public access to information.  By focusing both

agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decision-making by agencies and fosters public participation.

27.     To accomplish these objectives, NEPA requires "responsible [federal] officials" to prepare an environmental impact statement (EIS) to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  To determine whether the impacts of a proposed action are significant enough to warrant preparation of an EIS, the agency may prepare an Environmental Assessment or "EA."

28.     Under NEPA's implementing regulations, an agency's EA must include "brief discussions of the need for the proposal, of alternatives . . . , [and] of the environmental impacts of the proposed action and alternatives." 40 C.F.R. § 1508.9(b).  The EA must take a "hard look" at the impacts, and if the agency decides the impacts are not significant, it must supply a convincing statement of reasons why.

29.     The EA must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts. *Id.* §§ 1508.7, 1508.8.  Such analysis must include all reasonably foreseeable impacts of the proposed action. *Id.*

30.     NEPA's implementing regulations require that the agency "shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions," and shall ensure the scientific accuracy and integrity of its environmental analysis. *Id.* § 1502.24.  The agency must disclose if information is incomplete or unavailable and explain "the relevance of the incomplete or

unavailable information to evaluating reasonably foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1).

31.    If, after preparing an EA, the agency determines an EIS is not required, the agency must provide a "convincing statement of reasons" why the project's impacts are insignificant and issue a Finding of No Significant Impact or "FONSI." 40 C.F.R. §§ 1501.4, 1508.9 & 1508.13.

## VII.   FACTS

A.    <u>EPA's 2015 Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category</u>

32.    EPA proposed the Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category (ELG Rule) in June 2013, explaining that steam electric power plants "contribute 50-60 percent of all toxic pollutant discharged into surface waters by all industrial categories," and that these level of pollution will only further increase "as pollutants are increasingly captured by air pollution controls and transferred to wastewater discharges."  Effluent Limitations Guidelines and Standards for the Steam Electric Power Generating Point Source Category, Proposed Rule, 78 Fed. Reg. 34,432 (June 7, 2013).  As detailed by EPA in its Environmental Assessment (EA) on the ELG Rule and elsewhere, these pollutants, such as mercury and selenium, are damaging a variety of wildlife species inhabiting a wide range of water-based ecosystems across the United States, and pose concrete risks to human health. EPA found that the proposed ELG Rule would reduce pollutant loadings

1    from existing sources by more than 95 percent for copper, lead, mercury, nickel,

2    selenium, thallium, and zinc, and more than 90 percent for arsenic and cadmium.

3    33.    Similarly, in issuing the Final 2015 ELGs, EPA found that the requirements would

4    reduce the amount of pollutants that steam electric power plants are discharging by 1.4

5    billion pounds. 80 Fed. Reg. 67,838, 67,841 (Nov. 3, 2015). EPA found that these

6    concrete environmental improvements would reduce harm to human health and wildlife,

7    explaining the Rule would provide a "significant number of environmental and ecological

8    improvements and reduced impacts to wildlife and humans from reductions in pollutant

9    loadings . . . ." *Id.* at 67,873; *see also id.* at 67,874.

10
            B.    Administrator Pruitt's Proposed Delay Rule To Roll Back the Final ELG
11                Rule

12   34.    On April 12, 2017, in purported response to requests for "reconsideration"

13   Administrator Pruitt announced he would "reconsider" the ELG Rule and immediately

14   purported to "stay" the rule pending reconsideration. 82 Fed. Reg. 19,005 (April 25,

15   2017). On June 6, 2017, Administrator Pruitt proposed the ELG Delay Rule, claiming

16   compliance dates should be extended because he is reconsidering the Final ELG Rule and

17   has decided polluting companies should not have to start working toward compliance

18   until that reconsideration process is completed. 82 Fed. Reg. 26,017 (June 6, 2017).

19   35.    In public comments on that proposal, the Center explained EPA could not finalize

20   the ELG Delay Rule without first complying with the ESA and NEPA, 42 U.S.C. § 4321,

21   *et seq.* With respect to the ESA in particular, the Center explained that EPA must obtain

22   a Biological Opinion from the Services addressing whether the Delay Rule may

jeopardize the continued existence of listed species or adversely modify critical habitat; the extent to which the Delay Rule will incidentally take listed species; and the specific measures EPA must carry out to minimize and mitigate those adverse effects. *See* 16 U.S.C. § 1536.

36.     On September 18, 2017, EPA issued its final ELG Delay Rule, delaying the compliance dates for major portions of the 2015 ELGs by two years. 82 Fed. Reg. 43,494 (Sept. 18, 2017) (codified at 40 C.F.R. §§ 423.11(t); 423.13(g)(1)(i), (k)(1)(i); 423.15(e), (g)).

37.     Parroting the insufficient rationale put forward in support of the Proposed Rule, EPA stated that it is delaying the compliance dates for best available technology economically achievable (BACT) effluent limitations and pretreatment standards (PSES) for flue gas desulfurization (FGD) wastewater and bottom ash transport water for two years. *Id.* In particular, while making no substantive findings about changes needed to the 2015 ELGs, EPA decided it was appropriate to delay compliance simply to relieve certain coal-burning power plants of complying with the 2015 ELGs while EPA reconsiders them. *Id.*

38.     Moreover, EPA made it clear that the two-year delay in the ELG Delay Rule was only an *initial* delay, stating that it intends to "further postpone the compliance dates" if necessary to make sure certain coal-burning power plants need not comply until EPA has completed its process of reconsidering – and presumably eliminating or at least significantly weakening – the 2015 ELGs. *Id.* at 43,498 n.6.

39.     In a separate "Response to Comments" document accompanying the ELG Delay Rule, EPA rejected the argument that it had any obligation to engage in ESA Section 7 consultation before issuing the Final Rule.  According to EPA, it was "not required to consult on this action because the Agency lacks discretion to account for effects on species."

40.     EPA does not appear to dispute that the ELG Delay Rule will have adverse impacts on protected species that should trigger the Section 7 consultation process. Indeed, such an argument would be impossible to reconcile with the myriad findings in the record concerning these impacts. To provide just a few examples:

• EPA's own Environmental Assessment for the Final ELG Rule explained that, as a result of the pollutants discharged from these power plants, aquatic species experience "acute effects (e.g., fish kills) and chronic effects (e.g., malformations, and metabolic, hormonal, and behavioral disorders)," as well as "reduced growth and reduced survival [and] changes to the local habitat." EPA, ENVIRONMENTAL ASSESSMENT FOR EFFLUENT LIMITATIONS GUIDELINES AND STANDARDS FOR STEAM ELECTRIC POWER 3-20 (2015).

• The same EA identified "138 threatened and endangered species whose habitats overlap with, or are located within, surface waters that exceeded" water quality standards, and explained that, "[b]ased on evidence in the literature, damage cases, other documented impacts, and modeled receiving water pollutant concentrations, it is clear that current wastewater discharge practices at steam

electric power plants are impacting the surrounding aquatic and terrestrial environments . . . ." *Id.* at 9-1.

· In issuing the 2015 ELGs EPA explained that the agency "expects that once the rule is implemented the number of immediate receiving waterbodies with potential impacts to wildlife will begin to be reduced by more than half compared to baseline conditions . . . ." 80 Fed. Reg. at 67,874.

41.     EPA also explained that the ELGs "will improve aquatic and wildlife habitats in the immediate and downstream receiving waters from steam electric power plant discharges," and that "these water quality and habitat improvements will enhance efforts to protect threatened and endangered species." *Id.*.

42.     The cost-benefit analysis that accompanied the Final Rule also explained that "[f]or threatened and endangered (T&E) species vulnerable to future extinction, [because] even minor changes to reproductive rates and small levels of mortality may represent a substantial portion of annual population growth," "steam electric power plant discharges may either lengthen recovery time, or hasten the demise of these species," and, consequently, the ELGS would positively affect the "recovery trajectory for 15 T&E species." EPA, BENEFIT AND COST ANALYSIS FOR EFFLUENT LIMITATIONS GUIDELINES 2-7, 5-4 (2015).  Given that the record overwhelmingly shows implementation of the Final ELG Rule would reduce take and other adverse impacts on protected species from power plants discharges, it is clear that EPA may affect such species by delaying those increased protections through the ELG Delay Rule,—thereby requiring Section 7 consultation.

43.     The fact that, as of today, the coal-burning power plants covered by the Delay

Rule are not *yet* required to reduce these discharges under the ELG Rule does not impact

EPA's obligation to consult on the adverse impacts of the Delay Rule.  In considering the

effects of an action, the ESA's implementing regulations require an agency to consider

those effects in the context of the "environmental baseline," which includes "the past and

present impacts of all Federal, State or private actions and other human activities in the

action area . . . ." 50 C.F.R. § 402.02; *Defs. of Wildlife v. Babbitt*, 130 F. Supp. 2d 121,

126-27 (D.D.C. 2001). The Final ELG Rule was thus an existing action that EPA was

required to make part of the baseline for its analysis. *See, e.g., Nat'l Wildlife Fed'n v.*

*Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 929-931 (9th Cir. 2007) (requiring agency

evaluate the impacts of proposed dam management actions in light of the most

environmentally protective status quo); *Am. Rivers, Inc. v. U.S. Army Corps of Eng'rs*,

421 F.3d 618 (8th Cir. 2005) (same); *see also Ctr. for Biological Diversity v. EPA*,

861F.3d 174 (D.C. Cir. 2017) (finding consultation required for pesticide registration).

## VIII.  CLAIM FOR RELIEF

### CLAIM ONE
**(ESA Failure to Consult)**

44.     Plaintiff incorporates by reference paragraphs 1 through 43.

45.     Section 7 of the ESA mandates that:

Each Federal agency shall, in consultation with and with the assistance of
the Secretary, insure that any action authorized, funded, or carried out by
such agency . . . is not likely to jeopardize the continued existence of any
endangered species or threatened species or result in the destruction or
adverse modification of habitat of such species which is determined by the

COMPLAINT – 15

1    Secretary, after consultation as appropriate with affected States, to be

2    critical . . . .

3    16 U.S.C. § 1536(a)(2).

4    46.     Under the ESA's joint implementing regulations from the FWS and NMFS,

5    whenever a proposed action "may affect" listed species, the agency must initiate this

6    consultation process, 50 C.F.R. § 402.14(a), which generally culminates in one or more

7    Biological Opinions that evaluate the impacts of the action on protected species,

8    including both the "incidental take" of species that will occur, and the steps that must be

9    taken to minimize and mitigate those adverse impacts. 16 U.S.C. § 1536(b); 50 C.F.R. §

10   402.14(g).

11   47.     The Delay Rule is an agency action.

12   48.     The Delay Rule may affect ESA-listed species or designated critical habitat.

13   49.     EPA has discretion regarding the promulgation of the Delay Rule.  EPA justified

14   the Delay Rule precisely on its "inherent discretion . . . to reconsider past policy decisions

15   consistent with the CWA and other applicable law." 82 Fed. Reg. at 43,496 (emphasis

16   added);  *see also id.* (claiming EPA is "afforded considerable discretion in deciding"

17   whether to delay compliance dates); ("EPA has discretion in determining technological

18   availability and economic achievability and is not constrained by the CWA to make the

19   same policy decision as the former Administration, so long as its decision is reasonable")

20   (emphasis added).

## CLAIM TWO
### (Failure to Conduct NEPA Analysis)

21   50.     Plaintiff incorporates by reference paragraphs 1 through 49.

22

COMPLAINT – 16

51.     Pursuant to NEPA, EPA must take a "hard look" at the consequences, environmental impacts, and adverse effects of its proposed actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.9. NEPA requires "responsible [federal] officials" to prepare an environmental impact statement (EIS) to consider the effects of each "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).   The effects analysis must analyze not only the direct impacts of a proposed action, but also the indirect and cumulative impacts. 40 C.F.R. §§ 1508.7, 1508.8, 1508.9.  Such analysis must include all reasonably foreseeable impacts of the proposed action.

52.     The Delay Rule is a Federal action.

53.     EPA has discretionary regarding the promulgation of the Delay Rule.

54.     EPA did not prepare an EIS for the Delay Rule.

55.     EPA did not prepare an EA for the Delay Rule.

56.     EPA did not make a finding of no significant impacts for the Delay Rule.

57.     By failing to prepare an EA and finding of no significant impacts or an EIS for the Delay Rule, EPA violated NEPA.  This made the Delay Rule otherwise contrary to law.

**REQUEST FOR RELIEF**

WHEREFORE, the Center respectfully requests that the Court:

A.     Declare that EPA is in violation of section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), by failing to complete consultation necessary to ensure that the Delay Rule is not likely to jeopardize the continued existence of listed species or destroy or adversely modify their critical habitat and Delay Rule is otherwise contrary to

1    law because EPA failed to comply with NEPA prior to promulgating the Delay

2    Rule;

3    B.    Enjoin, vacate and remand the Delay Rule for EPA to complete ESA consultation

4    and a NEPA Analysis;

5    C.    Retain jurisdiction of this matter for purposes of enforcing the Court's order;

6    D.    Grant Plaintiff their reasonable costs of litigation, including attorneys' and

7    experts' fees; and;

8    E.    Grant such further relief as the Court deems just and proper.

9
10   Dated: January 30, 2018              Respectfully submitted,

11                                         */s/ Jennifer L. Loda*
                                          Jennifer L. Loda (CA Bar No. 284889)*
12                                         CENTER FOR BIOLOGICAL DIVERSITY
                                          1212 Broadway, Ste 800
                                          Oakland, CA  94612
13                                         Phone: 510-844-7100 x336
                                          Email: jloda@biologicaldiversity.org
14
                                          Robert Ukeiley (CO Bar No. 26747)*
15                                         CENTER FOR BIOLOGICAL DIVERSITY
                                          1536 Wynkoop St., Ste. 421
16                                         Denver, CO 80202
                                          Phone: (720) 496-8568
17                                         email: rukeiley@biologicaldiversity.org

18                                         Hannah M.M. Connor (FL Bar No. 125378)*
                                          CENTER FOR BIOLOGICAL DIVERSITY
19                                         P.O. Box 2155
                                          St. Petersburg, FL 33731
20                                         Phone: (202) 681-1676
                                          email: hconnor@biologicaldiversity.org
21
                                          *Counsel for Plaintiff*
22                                         * Seeking Admission *pro hac vice*

COMPLAINT – 18